1   Thomas C. Patton, OSB No. 963889
    Thomas C. Patton, P.C.
2   Email: Tom@TomPattonLaw.Com
    8 North State Street, Suite 301
3   Lake Oswego, OR 97034
    Telephone: (503) 546 -3357
4   Facsimile: (503) 636-8512

5
        Attorney for Plaintiffs
6

7

8                   UNITED STATES DISTRICT COURT

9                        DISTRICT OF OREGON

10                       PORTLAND DIVISION

11

12  SCOTT VAN DER ZANDEN, and SUSIE          )
    VAN DER ZANDEN,                          )   Case No. _____
13                                           )
                    Plaintiffs,              )
14      vs.                                  )   PLAINTIFFS' COMPLAINT AND
                                             )   DEMAND FOR JURY TRIAL
15  MONSANTO COMPANY, INC, a Foreign         )
    Corporation,                             )   Civil Action for Strict Liability, Breach of
16                                           )   Implied Warranty, Negligence, Punitive
                                             )   Damages, Loss of Consortium
17                  Defendant.               )
                                             )
18  _____ )
                                             )
19

20          COMES NOW Plaintiffs, by and through their undersigned attorney, for cause of action

21  against defendant alleges as follows:

22                              **I. INTRODUCTION**

23          1. In 1970, defendant Monsanto Company, Inc., discovered the herbicidal properties of

24  glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

25  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with farmed

26

 Page 1 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1  crops.  By 2001, glyphosate had become the most-used active ingredient in American

2  agriculture with 85-90 million pounds used annually.  Its use grew to 185 million pounds by

3  2007.  As of 2013, glyphosate was the world's most widely used herbicide.

4      2.  Monsanto is a multinational agricultural biotechnology corporation based in St.

5  Louis, Missouri.  It is the world's leading producer of glyphosate.  As of 2009, Monsanto was

6  also the leading producer of seeds, accounting for 27% of the world seed market.  The majority

7  of these seeds are the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops

8  is that they substantially improve a farmer's ability to control weeds, because glyphosate can be

9  sprayed in the fields during the growing season without harming their crops.  In 2010, an

10  estimated 70% of corn and cotton, and 90% of soybean fields in the U.S. were Roundup

11  Ready®.

12      3.  Monsanto's glyphosate products are registered in 130 countries and approved for use

13  on over 100 different crops.  They are ubiquitous in the environment.  Numerous studies

14  confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where

15  Roundup® is used.  It has been found in food, in the urine of agricultural workers, and even in

16  the urine of urban dwellers who are not in direct contact with glyphosate.

17

18      4.  On March 20, 2015, the International Agency for Research on Cancer (IARC), a

19  World Health Organization (WHO) agency, issued an evaluation of several herbicides,

20  including glyphosate.  That evaluation was based in part on studies of exposures to glyphosate

21  in several countries around the world, and it traces the health implications from exposure to

22  glyphosate since 2001.

23      5.  On July 29, 2015, the IARC issued the formal monograph relating to glyphosate.  In

24  that monograph, the IARC Working Group provides a thorough review of the numerous studies

25  and data relating to glyphosate exposure in humans.

26

Page 2 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

6. The IARC Working Group classified glyphosate as a Group 2A herbicide, meaning that it is probably carcinogenic to humans. They also concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7. The IARC evaluation is significant, and confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to US consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or the environment.

## II. JURISDICTION AND VENUE

9. Jurisdiction is conferred upon this Court by 28 U.S.C. §1332, diversity jurisdiction, because the case is between citizens of different states, and the amount in controversy exceeds $75,000.

10. Plaintiffs request that this Court invoke its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to the causes of action based upon Oregon law, because the state claims arise from the same nucleus of operative facts as the federal claims.

11. Venue is appropriate in the District of Oregon pursuant to 28 U.S.C. §1391(b) because the claims arose in this judicial district.

/////

/////

/////

Page 3 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

### III. PARTIES

**Plaintiffs**

12.  Plaintiff Scott VanDerZanden is a private US citizen, and at all material times was a resident of Forrest Grove, Oregon.  Mr. VanDerZanden lives on his farm and regularly used Monsanto's Roundup® and other glyphosate-containing products for decades and suffered severe physical, economic, and emotional injuries as a result, including but not limited to non-Hodgkin's lymphoma diagnosed in 2009.  Plaintiff Susie VanDerZanden is a private US citizen and was and is the wife of Mr. VanDerZanden, and resides with him on their farm in Forrest Grove.  As a result of Mr. VanDerZanden's use of Roundup® and resulting injuries, she suffered the loss of his love and companionship and seeks damages for loss of consortium.

**Defendant**

13.  Defendant Monsanto Company, Inc., (Monsanto) is a Delaware corporation with its principal place of business in Saint Louis, Missouri.  At all material times, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.  Monsanto has regularly transacted and conducted business within the state of Oregon, and has derived substantial revenue from goods and products, including Roundup®, used in the state of Oregon.  Monsanto expected their acts to have consequences within the state of Oregon, and derived substantial revenue from interstate commerce.

14.  On information and belief, in committing the acts alleged herein, each and every agent, managing agent, representative, and/or employee, of Monsanto was working within the course and scope of said agency, management, representation and/or employment with the knowledge, consent, ratification, and authorization of Monsanto and its directors, officers, and managing agents, in furtherance of Monsanto's financial interests.

Page 4 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

## IV. FACTS

15.  Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

16.  Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form the aromatic amino acids necessary for protein synthesis.

17.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

18.  For 40 years, farms in Oregon and around the world have used Roundup® without knowing the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough because it could kill almost any weed without causing harm to people or the environment.  Of course, history has shown that to be untrue.  According to the WHO, the main chemical ingredient in Roundup® - glyphosate – is a probable cause of cancer.  Those most at risk are farm owners and workers and others with workplace exposure to Roundup®, such as those in garden centers, nurseries, and landscapers.

19.  Monsanto assured the public that Roundup® was harmless.  To prove it, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers.  Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general public that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

20.  The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.  From the outset, Monsanto marketed Roundup®

Page 5 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    as a "safe" general-purpose herbicide for widespread commercial and consumer use.  Monsanto

2    still markets Roundup® as safe today.

3    **Registration of Herbicides Under Federal Law**

4    21.  The manufacture, formulation and distribution of herbicides, such as Roundup®,

5    are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or

6    "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the

7    Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use,

8    except as described by the Act. 7 U.S.C. § 136a(a).

9    22.  Because pesticides are toxic to plants, animals, and humans, at least to some degree,

10   the EPA requires as part of the registration process, among other things, a variety of tests to

11   evaluate the potential for exposure to pesticides' toxicity to people and other potential non-

12   target organisms, and other adverse effects on the environment. Registration by the EPA,

13   however, is not an assurance or finding of safety. The determination the Agency must make in

14   registering or re-registering a product is not that the product is "safe," but rather that use of the

15   product in accordance with its label directions "will not generally cause unreasonable adverse

16   effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

17

18   23.  FIFRA defines "unreasonable adverse effects on the environment" to mean "any

19   unreasonable risk to man or the environment, taking into account the economic, social, and

20   environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

21   requires EPA to make a risk/benefit analysis in determining whether a registration should be

22   granted or allowed to continue to be sold in commerce.

23   24.  The EPA registered Roundup® for distribution, sale, and manufacture in the United

24   States and the State of Oregon.

25   /////

26

Page 6 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

25. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

26. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

27. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®**

28. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

29.  On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

30.  In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

31.  In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it, too, found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

32. Three top executives of IBT were convicted of fraud in 1983.

33. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

34. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

/////

Page 8 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

**The Importance of Roundup® to Monsanto's Market Dominance Profits**

35. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

36. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

37. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has known for decades that it falsely advertises the safety of Roundup®.**

38. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the

Page 9 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1   lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based

2   herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to

3   mammals, birds, and fish. Among the representations the NYAG found deceptive and

4   misleading about the human and environmental safety of Roundup® are the following:

5        a)  Remember that environmentally friendly Roundup herbicide is

6        biodegradable. It won't build up in the soil so you can use Roundup with

7        confidence along customers' driveways, sidewalks and fences ...

8        b) And remember that Roundup is biodegradable and won't build up in the soil.

9        That will give you the environmental confidence you need to use Roundup

10       everywhere you've got a weed, brush, edging or trimming problem.

11       c) Roundup biodegrades into naturally occurring elements.

12       d) Remember that versatile Roundup herbicide stays where you put it. That

13       means there's no washing or leaching to harm customers' shrubs or other

14       desirable vegetation.

15       e) This non-residual herbicide will not wash or leach in the soil. It ... stays

16       where you apply it.

17       f) You can apply Accord[1] with "confidence because it will stay where you put

18       it" it bonds tightly to soil particles, preventing leaching. Then, soon after

19       application, soil microorganisms biodegrade Accord into natural products.

20       g)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

21       h)  Glyphosate's safety margin is much greater than required. It has over a

22       1,000-fold safety margin in food and over a 700-fold safety margin for

23       workers who manufacture it or use it.

24

25   _____

26   [1] Accord® is another glyphosate-containing product of defendant Monsanto.

Page 10 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1      i)  You can feel good about using herbicides by Monsanto. They carry a

2      toxicity category rating of 'practically non-toxic' as it pertains to mammals,

3      birds and fish.

4      j) "Roundup can be used where kids and pets will play and breaks down into

5      natural material." This ad depicts a person with his head in the ground and

6      a pet dog standing in an area which has been treated with Roundup

7      39.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

8   with NYAG, in which Monsanto agreed, among other things, "to cease and desist from

9   publishing or broadcasting any advertisements [in New York] that represent, directly or by

10  implication" that:

11     a) its glyphosate-containing pesticide products or any component thereof are

12     safe, non-toxic, harmless or free from risk. ***

13     b) its glyphosate-containing pesticide products or any component thereof

14     manufactured, formulated, distributed or sold by Monsanto are

15     biodegradable ***

16     c) its glyphosate-containing pesticide products or any component thereof stay

17     where they are applied under all circumstances and will not move through

18     the environment by any means. ***

19     d) its glyphosate-containing pesticide products or any component thereof are

20     "good" for the environment or are "known for their environmental

21     characteristics." * * *

22     e)  glyphosate-containing pesticide products or any component thereof are

23     safer or less toxic than common consumer products other than herbicides;

24  /////

25

26

Page 11 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    f)  its glyphosate-containing products or any component thereof might be

2    classified as "practically non-toxic."

3        40.  Monsanto did not alter its advertising in the same manner in any state other than

4    New York, and on information and belief still has not done so today.

5        41.  In 2009, France's highest court ruled that Monsanto had not told the truth about the

6    safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely

7    advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

8                    **Classifications and Assessments of Glyphosate**

9        42.  The IARC process for the classification of glyphosate followed the stringent

10   procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program

11   has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1

12   (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287

13   agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not

14   Classified); and one agent to be Probably Not Carcinogenic.

15       43.  The established procedure for IARC Monograph evaluations is described in the

16   IARC Programme's Preamble. Evaluations are performed by panels of international experts,

17   selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

18       44. One year before the Monograph meeting, the meeting is announced and there is a

19   call both for data and for experts. Eight months before the Monograph meeting, the Working

20   Group membership is selected and the sections of the Monograph are developed by the Working

21   Group members. One month prior to the Monograph meeting, the call for data is closed and the

22   various draft sections are distributed among Working Group members for review and comment.

23   Finally, at the Monograph meeting, the Working Group finalizes review of all literature,

24   evaluates the evidence in each category, and completes the overall evaluation. Within two

26

Page 12 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

45.  In assessing an agent, the IARC Working Group reviews the following information:

a)  human, experimental, and mechanistic data;

b)  all pertinent epidemiological studies and cancer bioassays; and

c)  representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

46.  In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

47. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

48. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland,

/////

Page 13 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    and municipal weed-control workers in the United Kingdom; and para-occupational exposure in

2    farming families.

3        49. Glyphosate was identified as the second-most used household herbicide in the

4    United States for weed control between 2001 and 2007 and the most heavily used herbicide in

5    the world in 2012.

6        50. Exposure pathways are identified as air (especially during spraying), water, and

7    food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and

8    groundwater, as well as in food.

9        51. The assessment of the IARC Working Group identified several case-control studies

10   of occupational exposure in the United States, Canada, and Sweden. These studies show a

11   human health concern from agricultural and other work-related exposure to glyphosate.

12       52. The IARC Working Group found an increased risk between exposure to glyphosate

13   and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk

14   persisted after adjustment for other pesticides.

15       53.  The IARC Working Group also found that glyphosate caused DNA and

16   chromosomal damage in human cells. One study in community residents reported increases in

17   blood markers of chromosomal damage (micronuclei) after glyphosate formulations were

18   sprayed.

19       54.  In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare

20   tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in

21   male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A

22   glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

23       55. The IARC Working Group also noted that glyphosate has been detected in the urine

24   of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

25

26

Page 14 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1   aminoethyl phosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal

2   microbial metabolism in humans.

3        56. The IARC Working Group further found that glyphosate and glyphosate

4   formulations induced DNA and chromosomal damage in mammals, and in human and animal

5   cells in utero.

6        57.  The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects

7   in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic

8   amino acids, which leads to several metabolic disturbances, including the inhibition of protein

9   and secondary product biosynthesis and general metabolic disruption.

10        58. The IARC Working Group also reviewed an Agricultural Health Study, consisting

11   of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.

12   While this study differed from others in that it was based on a self-administered questionnaire,

13   the results support an association between glyphosate exposure and Multiple Myeloma, Hairy

14   Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other

15   cancers.

16

17        **Other Earlier Findings About Glyphosate's Dangers to Human Health**

18        59. The EPA has a technical fact sheet, as part of its Drinking Water and Health,

19   National Primary Drinking Water Regulations publication, relating to glyphosate. This technical

20   fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release

21   patterns for glyphosate as follows:

22        Release Patterns

23        60. Glyphosate is released to the environment in its use as a herbicide for controlling

24   woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These

25   sites may be around water and in wetlands. It may also be released to the environment during its

26

Page 15 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1  manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since

2  glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its

3  manufacture and handling are not available. Occupational workers and home gardeners may be

4  exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup.

5  They may also be exposed by touching soil and plants to which glyphosate was applied.

6  Occupational exposure may also occur during glyphosate's manufacture, transport storage, and

7  disposal.

8      61.  In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in

9  California, the state with the most comprehensive program for reporting of pesticide-caused

10  illness, glyphosate was the third most commonly-reported cause of pesticide illness among

11  agricultural workers.

12                    **Recent Worldwide Bans on Roundup®/Glyphosate**

13
14      62.  Several countries around the world have instituted bans on the sale of Roundup®

15  and other glyphosate-containing herbicides, both before and since IARC first announced its

16  assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as

17  the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on

18  all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the

19  end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful

20  legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to

21  private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting

22  customers have no idea what the risks of this product are. Especially children are sensitive to

23  toxic substances and should therefore not be exposed to it."

24      63.  The Brazilian Public Prosecutor in the Federal District requested that the Brazilian

25  Justice Department suspend the use of glyphosate.

26

Page 16 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

64. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

65. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

66. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

67. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

**Equitable Tolling of Applicable Statute of Limitations**

68. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

69. The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup® and glyphosate.

70. At all relevant times, Defendant has maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

71. Indeed, even as of May 2019, and in the wake of three juries finding otherwise, Defendant continued to represent to the public that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, is safe.

/////

Page 17 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

72. As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

73. Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup®. Defendant was under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup®. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

74. Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

75. Plaintiff Scott VanDerZanden began using and being exposed to Roundup® in his childhood while working on and around farms growing up.  He began using Roundup® and other glyphosate-containing products on his own home and farm property in about 1998. After a

Page 18 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1   lifetime of exposure to Roundup® and glyphosate, he was diagnosed with non-Hodgkin's

2   lymphoma in 2009.  In December 2017, Mr. VanDerZanden was advised by his doctor to stop

3   using Roundup®. In May 2019, he discovered that his non-Hodgkin's lymphoma was likely

4   caused by his use of Roundup®.

5                               **V.  CAUSES OF ACTION**

6                                    **Count I.**

7                            **Strict Liability (Design Defect)**

8

9          76.  Plaintiffs re-alleges and incorporates herein the preceding paragraphs of this

10   Complaint as if set forth in full.

11         77. Plaintiffs bring this strict liability claim against Monsanto for defective design.

12         78. At all times relevant to this litigation, Monsanto engaged in the business of testing,

13   developing, manufacturing, selling, distributing, marketing, packaging design, and promotion of

14   Roundup® products, which are defective and unreasonably dangerous to consumers, including

15   Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were

16   under the ultimate control and supervision of Monsanto. At all times relevant to this litigation,

17   Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled,

18   advertised, promoted, marketed, sold, and distributed the Roundup® products used by the

19

20   Plaintiffs, as described above.

21         79. At all times relevant to this litigation, Roundup® products were manufactured,

22   designed, and labeled in an unsafe, defective, and inherently dangerous manner that was

23   dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

24

25         80. At all times relevant to this litigation, Roundup® products reached the intended

26   consumers, handlers, and users or other persons coming into contact with these products in

Page 19 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    Oregon and throughout the United States, including Plaintiffs, without substantial change in

2    their condition as designed, manufactured, sold, distributed, labeled, and marketed by

3    Monsanto.

4          81. Roundup® products, as researched, tested, developed, designed, licensed,

5    manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in

6    design and formulation in that when they left the hands of the manufacturers and/or suppliers,

7    they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary

8    consumer would contemplate.

9          82. Roundup® products, as researched, tested, developed, designed, licensed,

10   manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defective

11   in design and formulation in that when they left the hands of the manufacturers and/or suppliers,

12   the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

13         83. At all times relevant to this action, Monsanto knew or had reason to know that

14   Roundup® products were defective and were inherently dangerous and unsafe when used in the

15   manner instructed and provided by Monsanto.

16         84. Therefore, at all times relevant to this litigation, Roundup® products, as researched,

17   tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and

18   marketed by Monsanto were defective in design and formulation, in one or more of the

19   following ways:

20         a) When placed in the stream of commerce, Roundup® products were defective in

21   design and formulation, and, consequently, dangerous to an extent beyond that which an

22   ordinary consumer would contemplate.

Page 20 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

b) When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d) Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g) Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h) Monsanto could have employed safer alternative designs and formulations.

85. Plaintiffs were exposed to Roundup® products in the course of working on their farm, as described above, without knowledge of their dangerous characteristics.

86. At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

/////

Page 21 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    87. Plaintiffs could not have reasonably discovered the defects and risks associated with

2    Roundup® or glyphosate-containing products before or at the time of exposure.

3    88. The harm caused by Roundup® products far outweighed their benefit, rendering

4    these products dangerous to an extent beyond that which an ordinary consumer would

5    contemplate. Roundup® products were and are more dangerous than alternative products and

6    Monsanto could have designed Roundup® products (including their packaging and sales aids) to

7    make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the

8    state of the industry's scientific knowledge was such that a less risky design or formulation was

9    attainable.

10   89. At the time Roundup® products left Monsanto's control, there was a practical,

11   technically feasible, and safer alternative design that would have prevented the harm without

12   substantially impairing the reasonably anticipated or intended function of those herbicides.

13   90. Monsanto's defective design of Roundup® products was willful, wanton, fraudulent,

14   malicious, and conducted with reckless disregard for the health and safety of users of the

15   Roundup® products, including the Plaintiffs herein.

16   91. Therefore, as a result of the unreasonably dangerous condition of its Roundup®

17   products, Monsanto is strictly liable to Plaintiffs.

18   92. The defects in Roundup® products caused or contributed to cause Plaintiffs' grave

19   injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained

20   their injuries.

21   93. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of

22   consumers and users of its products, including Plaintiffs, with knowledge of the safety problems

Page 22 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1   associated with Roundup® and glyphosate-containing products, and suppressed this knowledge

2   from the general public. Monsanto made conscious decisions not to redesign, warn, or inform

3   the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated

4   damages.

5

6         94. As a direct and proximate result of Monsanto placing defective Roundup® products

7   into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and

8   have endured physical pain and discomfort, as well as economic hardship, including

9   considerable financial expenses for medical care and treatment.

10                              **COUNT II.**

11                 **Strict Liability (Failure to Warn)**

12

13         95.  Plaintiffs re-alleges and incorporates herein the preceding paragraphs of this

14   Complaint as if set forth in full.

15         96. Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

16         97. At all times relevant to this litigation, Monsanto engaged in the business of testing,

17   developing, designing, manufacturing, marketing, selling, distributing, and promoting

18   Roundup® products, which are defective and unreasonably dangerous to consumers, including

19   Plaintiffs, because they do not contain adequate warnings or instructions concerning the

20   dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate.

21   These actions were under the ultimate control and supervision of Monsanto.

22         98. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled,

23   distributed, marketed, promoted, sold, and otherwise released into the stream of commerce

24   Roundup® products, and in the course of same, directly advertised or marketed the products to

25

26

Page 23 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks

2    associated with the use of Roundup® and glyphosate-containing products.

3    99. At all times relevant to this litigation, Monsanto had a duty to properly test, develop,

4    design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply,

5    provide proper warnings, and take such steps as necessary to ensure that Roundup® products

6    did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto

7    had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and

8    exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical

9    herbicides, is held to the knowledge of an expert in the field.

10   100. At the time of manufacture, Monsanto could have provided the warnings or

11   instructions regarding the full and complete risks of Roundup® and glyphosate-containing

12   products because it knew or should have known of the unreasonable risks of harm associated

13   with the use of and/or exposure to such products.

14   101. At all times relevant to this litigation, Monsanto failed to investigate, study, or test,

15   and promoted the safety or minimized the dangers to users and consumers of its product and to

16   those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

17

18   102. Despite the fact that Monsanto knew or should have known that Roundup® posed a

19   grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated

20   with use and exposure. The dangerous propensities of these products and the carcinogenic

21   characteristics of glyphosate, as described above, were known to Monsanto, or scientifically

22   knowable to Monsanto through appropriate research and testing by known methods, at the time

23   it distributed, marketed, promoted, supplied, or sold the product, and not known to end users

24   and consumers, such as Plaintiffs.

25   /////

26

Page 24 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

103. These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

104. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Oregon and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

105. Plaintiffs were exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

106. At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

107. Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

108. These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

/////

Page 25 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    109. The information that Monsanto did provide or communicate failed to contain

2    relevant warnings, hazards, and precautions that would have enabled consumers such as

3    Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto

4    disseminated information that was inaccurate, false, and misleading and which failed to

5    communicate accurately or adequately the comparative severity, duration, and extent of the risk

6    of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively

7    promote the efficacy of its products, even after it knew or should have known of the

8    unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed,

9    through aggressive marketing and promotion, any information or research about the risks and

10   dangers of exposure to Roundup® and glyphosate.

11   110. To this day, Monsanto has failed to adequately and accurately warn of the true risks

12   of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active

13   ingredient glyphosate, a probable carcinogen.

14

15   111. As a result of their inadequate warnings, Roundup® products were defective and

16   unreasonably dangerous when they left the possession and/or control of Monsanto, were

17   distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

18   112. Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure,

19   as described above, to provide adequate warnings or other clinically relevant information and

20   data regarding the appropriate use of these products and the risks associated with the use of or

21   exposure to Roundup® and glyphosate.

22   113. The defects in Roundup® products caused or contributed to cause Plaintiffs'

23   injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their

24   injuries.

25   /////

26

Page 26 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

114. Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

115. As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

## COUNT III.

### Breach of Implied Warranties

116.  Plaintiffs re-alleges and incorporates herein the preceding paragraphs of this Complaint as if set forth in full.

117. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

118. Before the time that Plaintiffs were exposed to the use of Roundup® products, Monsanto impliedly warranted to consumers and those exposed – including Plaintiffs – that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

119. Monsanto failed to disclose, however, that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-

/////

Page 27 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    containing products carries and increased risk of developing sever injuries, including plaintiffs'

2    injuries.

3         120. Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of

4    defendant and upon their implied warranties that Roundup® products were of merchantable

5    quality and safe and fit for their intended purpose or use.

6         121. Upon information and belief, Plaintiffs were at all material times in privity with

7    defendant Monsanto.

8         122. Plaintiffs are the intended third-party beneficiaries of implied warranties made by

9    Monsanto to the purchasers and/or users of their horticultural herbicides, and as such, Plaintiffs

10   are entitled to assert this claim.

11        123. The Roundup® products were expected to reach, and in fact did reach, consumers

12   and/or users, including Plaintiffs, without substantial change in the condition in which they were

13   manufactured and sold by defendant.

14        124. At all relevant times, defendant was aware that consumers and users of their

15   products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which

16   is to say that Plaintiffs were the foreseeable users of Roundup®.

17

18        125. Monsanto intended that Roundup® products be used in the manner in which

19   Plaintiffs were exposed to it, and Monsanto impliedly warranted each product to be of

20   merchantable quality and safe and fit for this use, despite the fact that Roundup® was not

21   adequately tested and/or researched.

22        126. In reliance upon Monsanto's implied warranty, Plaintiffs used and were exposed to

23   Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, and

24   marketed by Monsanto.

25   /////

26

Page 28 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1     127. Plaintiffs could not have reasonably discovered or known of the risks of serious

2  injury associated with Roundup® or glyphosate.

3     128. Monsanto breached their implied warranty to Plaintiffs in that Roundup® products

4  were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested.

5  Roundup® has dangerous propensities when used as intended and can cause serious injuries,

6  including Plaintiffs' injuries.

7     129. The harm caused by Roundup® products far outweighed their benefits, rendering

8  the products more dangerous than an ordinary consumer or user would expect and more

9  dangerous than alternative products.

10     130. As a direct result of Monsanto's wrongful acts and omissions, Plaintiff Scott

11  VanDerZanden suffered severe and permanent physical and emotional injuries, including but

12  not limited to his diagnosis of non-Hodgkin's lymphoma. Plaintiffs have endured pain and

13  suffering, have suffered economic losses (including significant expenses for medical care and

14  treatment) and will continue to incur these expenses in the future.

15

16                          **COUNT IV.**

17             **Oregon Common Law - Negligence**

18     131. Plaintiffs re-alleges and incorporates herein the preceding paragraphs of this

19  Complaint as if set forth in full.

20     132. Monsanto, directly or indirectly, caused Roundup® products to be packaged,

21  labeled, marketed, promoted, distributed, sold, and/or used by Plaintiffs.

22     133. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable

23  care in the design, research, manufacture, marketing, advertisement, supply, promotion,

24  packaging, sale, and distribution of Roundup® products, including the duty to take all

25  /////

26

Page 29 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1   reasonable steps necessary to manufacture, promote, and/or sell a product that was not

2   unreasonably dangerous to consumers and users of the product.

3        134. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable

4   care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of

5   care owed to consumers and the general public included providing accurate, true, and correct

6   information concerning the risks of using Roundup® and appropriate, complete, and accurate

7   warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular,

8   its active ingredient glyphosate.

9        135. At all times relevant to this litigation, Monsanto knew or, in the exercise of

10   reasonable care, should have known of the hazards and dangers of Roundup® and specifically,

11   the carcinogenic properties of the chemical glyphosate.

12

13        136. Accordingly, at all times relevant to this litigation, Monsanto knew or, in the

14   exercise of reasonable care, should have known that use of or exposure to its Roundup®

15   products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and

16   unreasonable risk of injury to the users of these products, including Plaintiffs.

17        137. Monsanto also knew or, in the exercise of reasonable care, should have known that

18   users and consumers of Roundup® were unaware of the risks and the magnitude of the risks

19   associated with use of and/or exposure to Roundup® and glyphosate-containing products.

20        138. As such, Monsanto breached the duty of reasonable care and failed to exercise

21   ordinary care in the design, research, development, manufacture, testing, marketing, supply,

22   promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that

23   Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the

24   chemical glyphosate, knew or had reason to know of the defects inherent in these products,

25   knew or had reason to know that a user's or consumer's exposure to the products created a

26

Page 30 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1  significant risk of harm and unreasonably dangerous side effects, and failed to prevent or

2  adequately warn of these risks and injuries.

3      139. Despite an ability and means to investigate, study, and test these products and to

4  provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully

5  concealed information and has further made false and/or misleading statements concerning the

6  safety and/or exposure to Roundup® and glyphosate.

7      140. Monsanto was negligent in the following respects:

8      a) Manufacturing, producing, promoting, formulating, creating, developing, designing,

9  selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-

10 market testing;

11     b) Manufacturing, producing, promoting, formulating, creating, developing, designing,

12 selling, and/or distributing Roundup® while negligently and/or intentionally concealing and

13 failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and,

14 consequently, the risk of serious harm associated with human use of and exposure to

15 Roundup®;

16     c) Failing to undertake sufficient studies and conduct necessary tests to determine

17

18 whether or not Roundup® products and glyphosate-containing products were safe for their

19 intended use in agriculture and horticulture;

20     d) Failing to use reasonable and prudent care in the design, research, manufacture, and

21 development of Roundup® products so as to avoid the risk of serious harm associated with the

22 prevalent use of Roundup®/glyphosate as an herbicide;

23     e) Failing to design and manufacture Roundup® products so as to ensure they were at

24 least as safe and effective as other herbicides on the market;

25 /////

26

Page 31 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1     f) Failing to provide adequate instructions, guidelines, and safety precautions to those

2  persons who Monsanto could reasonably foresee would use and be exposed to its Roundup®

3  products;

4     g) Failing to disclose to Plaintiffs, users/consumers, and the general public that use of

5  and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

6     h) Failing to warn Plaintiffs, consumers, and the general public that the product's risk of

7  harm was unreasonable and that there were safer and effective alternative herbicides available to

8  Plaintiffs and other consumers;

9     i) Systematically suppressing or downplaying contrary evidence about the risks,

10  incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

11     j) Representing that its Roundup® products were safe for their intended use when, in

12  fact, Monsanto knew or should have known that the products were not safe for their intended

13  purpose;

14     k) Declining to make or propose any changes to Roundup® products' labeling or other

15  promotional materials that would alert the consumers and the general public of the risks of

16  Roundup® and glyphosate;

17

18     l) Advertising, marketing, and recommending the use of the Roundup® products, while

19  concealing and failing to disclose or warn of the dangers known by Monsanto to be associated

20  with or caused by the use of or exposure to Roundup® and glyphosate;

21     m) Continuing to disseminate information to its consumers, which indicate or imply that

22  Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural

23  industries; and

24     n) Continuing the manufacture and sale of its products with the knowledge that the

25  products were unreasonably unsafe and dangerous.

26

Page 32 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

141. Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

142. Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

143. Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

144. Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

145. As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff Scott VanDerZanden has suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering and have suffered significant mental, emotional, and physical damages, as well as special damages, including significant expenses for medical care and treatment.

## COUNT V.

### Punitive Damages

146.  Plaintiffs re-alleges and incorporates herein the preceding paragraphs of this Complaint as if set forth in full.

147. At all material times, Monsanto knew or should have known that Roundup® products were inherently dangerous with respect to their health risks.

Page 33 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    148. At all material times, Monsanto attempted to misrepresent and did misrepresent

2    facts concerning the safety of Roundup® products.

3    149. At all material times, Monsanto knew and recklessly disregarded the fact that

4    human exposure to Roundup® can and does cause health hazards, including non-Hodgkin's

5    lymphoma.

6

7    150. Notwithstanding the foregoing, Monsanto continued to aggressively market and

8    apply Roundup® without disclosing the risks.

9    151. Monsanto knew that Roundup® products were defective and were inherently

10   dangerous and unsafe as set forth herein, but continued to design, develop, manufacture,

11   distribute, sell, and aggressively market and apply it so as to maximize profits as the expense of

12   the health of the public, including Plaintiffs, in conscious and/or negligent disregard of the

13   foreseeable harm caused by Roundup®.

14

15   152. As a direct and proximate result of Monsanto's conscious and deliberate disregard

16   for the rights and safety of consumers such as Plaintiffs, Plaintiff Scott VanDerZanden suffered

17   severe and permanent physical injuries.  He has endured substantial pain and suffering and has

18   undergone extensive medical and surgical procedures, and radiation and chemo-therapy

19   treatments.  Plaintiffs have incurred substantial economic losses, including significant expenses

20   for medical care and treatment, which they will continue to incur into the future. Plaintiffs have

21   also suffered and will continue to suffer economic losses in the form of past lost wages, future

22   lost wages, and lost earning capacity. Plaintiffs' injuries are permanent, and will continue into

23   the future.

24   153. Monsanto's conduct was committed with knowing, conscious, and deliberate

25

26   disregard for the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs

Page 34 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1    to punitive damages in an amount appropriate to punish Monsanto and deter it from similar

2    conduct in the future.

3                                        **COUNT VI.**

4                                     **Loss of Consortium**

5         154.  Plaintiffs re-alleges and incorporates herein the preceding paragraphs of this

6    Complaint as if set forth in full.

7         155. Plaintiff Susie VanDerZanden is married to Scott VanDerZanden, and was married

8    to him when his injuries occurred and throughout his illness and extensive treatment.  Ms.

9    VanDerZanden was entitled to Mr. VanDerZanden's comfort, care, affection, companionship,

10   services, society, advice, guidance, counsel, and consortium and was deprived of such due to

11   Monsanto's conduct.  As a result, Ms. VanDerZanden has suffered non-economic damages an

12   amount not to exceed $1,000,000.

13                                **VII. PRAYER FOR RELIEF**

14        WHEREFORE, Plaintiffs prays for judgment against the Defendant as follows:

15                              1.   Plaintiff Scott VanDerZanden

16

17        a.      $90,000,000 in non-economic damages;

18        b.      $620,000 in economic damages in the form of past medical expenses, or

19                an amount to be proven at trial;

20        c.      $150,000 in economic damages in the form of future medical expenses, or

21                an amount to be proven at trial;

22        d.      $270,000 in economic damages in the form of lost wages;

23        e.      $1,000,000,000 in punitive damages; and,

24        e.      Plaintiffs' costs and disbursements incurred herein.

25   /////

26

 Page 35 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512

1          2.  Plaintiff Susie VanDerZanden

2      a.      Non-economic damages for loss of consortium in an amount not to exceed

3    $1,000,000.

4      156.  Plaintiffs pray for such other equitable or legal relief as the Court deems just.

5                        **VIII. RESERVATION OF RIGHTS**

6      157.  Plaintiffs reserves the right to assert additional claims as may be appropriate

7    following further investigation and discovery.

8                           **IX. JURY DEMAND**

9      158. Plaintiffs demand trial by Jury.

10     DATED this 29th day of August, 2019.

11

12                           By:  __/s *Thomas C. Patton*_____
                                    Thomas C. Patton, OSB No. 963889

13                                  Thomas C. Patton, P.C.
                                    E-mail:  Tom@TomPattonLaw.com

14                                  Trial Attorney for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

Page 36 – COMPLAINT

THOMAS C. PATTON, PC
Attorneys at Law
8 North State Street, Suite 301
Lake Oswego, Oregon 97034
Telephone (503) 546-3357
Facsimile (503) 636-8512